IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

OPEOLUWA ADIGUN, a.k.a. "Mary
Afolabi" and
CHUKWUKA ONYEKABA, a.k.a.
"Gabriel Onyekaba"

CRIMINAL CASE NO.

1:10-cr-00202-RWS-RGV

**ORDER FOR SERVICE OF MAGISTRATE JUDGE'S
FINAL REPORT AND RECOMMENDATION**

Attached is the Report and Recommendation of the United States Magistrate

Judge made in accordance with 28 U.S.C. § 636(b)(1) and N.D. Ga. Crim. R.

58.1(A)(3)(a) and (b).  Let the same be filed and a copy, with a copy of this Order, be

served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any,

to the Report and Recommendation within fourteen (14) days of receipt of this

Order.  Should objections be filed, they shall specify with particularity the alleged

error(s) made (including reference by page number to the transcript if applicable)

and shall be served upon the opposing party.  The party filing objections will be

responsible for obtaining and filing the transcript of any evidentiary hearing for

review by the District Court.  Failure to object to this Report and Recommendation waives a party's right to review.  Fed. R. Crim. P. 59(b)(2).

Pursuant to Title 18, U.S.C. § 3161(h)(1)(F), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act, whether or not objections are actually filed.**  The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED**, this 4th day of May, 2011.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | |
| v. | CRIMINAL CASE NO. |
| | 1:10-cr-00202-RWS-RGV |
| | |
| OPEOLUWA ADIGUN, a.k.a. "Mary Afolabi" and CHUKWUKA ONYEKABA, a.k.a. "Gabriel Onyekaba" | |

## <u>MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION</u>

Defendants Opeoluwa Adigun ("Adigun"), also known as "Mary Afolabi," and Chukwuku Onyekaba ("Onyekaba"), also known as "Gabriel Onyekaba," (collectively "defendants"), are charged in a forty-six count indictment with conspiracy in violation of 18 U.S.C. § 1029(b)(2), access device fraud in violation of 18 U.S.C. §§ 1029(a)(3), 1029 (a)(5), and 2, and aggravated identity theft in violation of 18 U.S.C. §§ 1028A(a)(1) and 2. [Doc. 1 at 1-7]. Adigun also is charged individually with bank fraud in violation of 18 U.S.C. §§ 1344 and 2; access device fraud in violation of 18 U.S.C. §§ 1029(a)(2) and 2; aggravated identity theft in violation of 18 U.S.C. §§ 1028A(a)(1) and (2); immigration fraud in violation of 18 U.S.C. § 1546(a); Social Security fraud in violation of 42 U.S.C. § 408(a)(6); passport fraud in violation of 18 U.S.C. § 1542; and mail theft in violation of 18 U.S.C. § 1708.

[Id. at 7-15].  Onyekaba also is charged individually with access device fraud in violation of 18 U.S.C. §§ 1029(a)(2), (a)(5) and 2; attempted access device fraud in violation of 18 U.S.C. §§ 1029(a)(2), (b)(1) and 2; and aggravated identity theft in violation of 18 U.S.C. §§ 1028A(a)(1) and 2.  [Id. at 15-22].

Defendants have filed several motions now pending before the Court. Adigun has filed a motion to sever the immigration fraud, social security fraud, and passport fraud charges, [Doc. 29]; a motion to suppress evidence seized during a warrantless search of her home, [Doc. 30]; a motion to suppress statements she made to law enforcement after her arrest, [Doc. 31]; a motion to suppress evidence seized following a March 6, 2010, traffic stop, [Doc. 32], motions to suppress evidence seized from a Lincoln Navigator on November 12, 2007, pursuant to a search warrant, [Docs. 42 & 49], and a motion to suppress evidence seized during a warrantless search of her business, G-Rock restaurant ("G-Rock restaurant"), [Doc. 73].  Onyekaba has moved to suppress all evidence and statements resulting from warrantless arrests during the years from 2006-2009, as well as evidence seized from the Lincoln Navigator on November 12, 2007, pursuant to a search warrant, and evidence seized following the traffic stop on March 6, 2010.  [Docs. 37 & 46].[1]

---

[1] Onyekaba's motions are vaguely worded, raising a general challenge to arrests and searches during a span of years, largely unsupported by any argument or brief.  The government has stipulated that it does not intend to use any statements arising from Onyekaba's May 2009 arrest, and Onyekaba's brief in support of his

Following evidentiary hearings on the motions, the parties have briefed the issues raised by the motions, see [Docs. 76, 77, 93, 94, 97, 99, 111, 114, & 117], and the matter is now ready for ruling.[2]   For the following reasons, the undersigned Magistrate Judge **RECOMMENDS** that Adigun's motion to sever, [Doc. 29], and defendants' motions to suppress, [Docs. 30, 31, 32, 37, 42, 46, 49, & 73], be **DENIED**.

## I.  STATEMENT OF FACTS

**A.     November 12, 2007, Search Warrant**

On November 12, 2007, Investigator Timothy Meeks ("Investigator Meeks") of the Cobb County Sheriff's Office ("CCSO") applied for a warrant to search the premises of 1337 Natchez Trace, Apartment B, Marietta, Georgia ("apartment B"), as well as a Lincoln Navigator ("the Navigator") with license number AUT 2768, and vehicle identification number ("VIN") 5LMFU27R13LJ35983, in connection with

---

motions, [Doc. 99], addresses only the March 6, 2010, vehicle stop in which Adigun was arrested, and joins Adigun's brief in support of her motion to suppress the November 12, 2007, warrant search of the Lincoln Navigator.  Accordingly, the Court will address only these issues and deems any other challenges initially raised by Onyekaba's motions as abandoned.

[2] See Docs. 63 and 110 for transcripts of the evidentiary hearings.  Citations to the evidentiary hearing transcripts hereinafter will be referred to as "[Doc. 63 at ___]" for the July 28, 2010 hearing and "[Doc. 110 at ___]" for the February 3, 2011 hearing.  In addition, the parties submitted exhibits at the hearings, which will be referred to as "(Gov. Ex. ___)," for the government's exhibits, and "(Def. Ex. ___)" for the defendants' exhibits.

a credit card fraud and identity theft investigation.[3]  [Doc. 49 at 1-2; Doc. 49-1 at 1-8; Doc. 77 at 2].  Investigator Meeks sought the warrant to seize, among other items, "computer hardware . . . such as central processing units, memory typewriters, and self-contained 'laptop' or 'notebook' computers," "computer software," and "business records, correspondence, notes, papers, ledgers, personal telephone and address books, . . . [and] documents which reflect the receipt, purchase, transmission and/or distribution of materials which related to the crime(s) [of financial identity fraud or card fraud-financial transaction]."  [Doc. 49-1 at 2-3].  In support of the application for the search warrant, Investigator Meeks set forth the following facts. [Id. at 3-4].

### 1.   *Facts in the Affidavit and Application for the Search Warrant*

On November 12, 2007, American Express fraud investigator Robert Simpson ("Simpson") reported a suspected identity fraud in connection with an application for a credit card in the name of Saiju Tharakan.  [Id. at 3].  Simpson reported that,

---

[3] The warrant at issue, attached to Adigun's original motion, [Doc. 42-1], obtained on November 12, 2007, is signed by Cobb County Magistrate Jennifer Frey ("Magistrate Frey"), [Id. at 4].  The supporting affidavit and application for the search warrant, signed by Investigator Meeks, is attached to Adigun's perfected motion, and states the probable cause for seeking the warrant.  See [Doc. 49-2 at 2-5]. The facts pertaining to the search of the Navigator are drawn from the warrant and affidavit in support of the warrant, [Doc. 49-1], from a recording of Investigator Meeks' testimony before Magistrate Frey in support of his application for the warrant, [Doc. 49-2], and from the parties' statements of fact in their briefs, [Docs. 49 & 77].

while verifying the application, American Express representatives discovered that Saiju Tharakan was a resident of Greenville, South Carolina, and that he was an identity theft victim. [Id.]. The person applying for the credit card had requested that it be shipped via overnight UPS to 1337 Natchez Trace, Apartment D, Marietta, Georgia. [Id.]. Concluding that the application was fraudulent, Simpson allowed the card to be shipped, but contacted CCSO to monitor the delivery and identify the individual accepting delivery. [Id.].

Simpson, Investigator Meeks, and CCSO Investigator Clay Bentley ("Investigator Bentley") conducted surveillance on the 1337 Natchez Trace address and surrounding areas from approximately 10:30 a.m. until 2:40 P.M, at which time they contacted a UPS driver in the area. [Id.]. Investigator Meeks determined that the UPS driver had with him a delivery from American Express addressed to a Saiju Tharakan at 1337 Natchez Trace, Apartment D. [Id. at 3-4]. The UPS driver agreed to deliver the package while Simpson and Investigators Meeks and Bentley observed. [Id. at 3].

The UPS driver attempted to deliver the package at apartment D, but was turned away by the resident who refused delivery. [Id.]. After the UPS driver got back into his delivery truck, an individual later identified as Onyekaba drove up next to the truck in the Navigator and briefly spoke with the UPS driver. [Id.]. The

UPS driver and Onyekaba met at the front of apartment B, and Onyekaba appeared to contact the occupant of apartment B, later identified as Keith Braxton ("Braxton"), to have him accept delivery of the package.  [Id. at 3-4].  Onyekaba left the package with Braxton, then walked back to the Navigator while talking on his cellular phone. [Id. at 4].

Simpson and Investigators Meeks and Bentley pulled their vehicle in front of the Navigator to prevent it from leaving, and Investigator Bentley got out of the vehicle and asked to speak with Onyekaba.  [Id.].  Onyekaba turned around, ran into the trees behind the apartment buildings, and Investigators Meeks and Bentley pursued him on foot for approximately 250 yards before apprehending him.  [Id.]. Investigators Meeks and Bentley returned to apartment B and contacted Braxton, who told them that the apartment was his, that he didn't know Onyekaba, but that Onyekaba used to live at the apartment and Onyekaba had told him that he needed to receive a package there.  [Id.].  Braxton could not explain why Onyekaba left without the package, however.  [Id.].  Investigators Meeks and Bentley conducted a sweep of apartment B in order to secure the scene prior to obtaining a search warrant, and located one additional person inside the apartment.  [Id.].  They also noted a loaded handgun in a coat closet, a stack of cash approximately five inches thick, and several phone cards laying on a table which Braxton said belonged to

Onyekaba. [Id.]. Investigator Meeks followed up with UPS and determined that on October 2, 2007, another delivery had been made to apartment B for Onyekaba. [Id.].

Investigator Meeks also stated the following:

> From my experience as a financial crimes investigator I know that it is important and common for the criminals to have access to several residential and/or business locations where they can accept deliveries such as checks and credit cards - but not be traced as the owner of the location. I know that it is likely that this Natchez Trace address is one of those locations used by Oneykaba [sic] with the permission of Braxton - Braxton being paid by a portion of Onyekaba's criminal proceeds.

[Id.]. With respect to the Navigator, Investigator Meeks stated:

> In the front seat of the Navigator that was driven by Onyekaba is a laptop computer, a Day Planner style agenda, and a check surrounded by assorted receipts. The fraudulent credit application submitted in the name of Saiju Tharakan was made via internet connection and was very likely done using the laptop visible in the Navigator.

[Id.].

### 2.   *Application for and Execution of the Search Warrant*

Investigator Meeks submitted his written affidavit and request for a search warrant and gave verbal testimony before Magistrate Frey. [Doc. 49-2; Doc. 77 at 2]. Investigator Meeks testified before Magistrate Frey that Onyekaba appeared to be using the Navigator as a "mobile office" based on the way he had set up the laptop,

the fact that it was surrounded by a day planner and "all kinds of paperwork" in the front seat, and the fact that he appeared to be driving to places he did not live to pick up credit cards. [Doc. 49-2 at 4:30, 4:58]. He testified that the American Express card the investigators had intercepted had been applied for on the internet, and that he believed it likely that the laptop in the Navigator had been used to complete the application. [Id. at 4:50]. Magistrate Frey questioned Investigator Meeks as to why he was seeking authority to seize digital cameras and video recorders, and Investigator Meeks responded that these devices were commonly used by identity theft suspects to make counterfeit identifications. [Id. at 5:42]. Magistrate Frey granted Investigator Meeks' request, and signed the search warrant at 6:44 p.m. on November 12, 2007. [Doc. 49-2 at 8]. Cobb County investigators then executed the warrant on the same day, seizing from the Navigator a laptop computer, six cellular phones, and a day planner containing the personal information of identity theft victims. [Doc. 42 at 3; Doc. 77 at 2].

**B.    Investigation of Adigun and Onyekaba**

**1.    *Preliminary Investigation and Identification of Victims***

Detective Louis Guy ("Detective Guy") of the Paulding County Sheriff's Office ("PCSO")[4] began investigating complaints of identity theft and credit card fraud in

---

[4] Detective Guy testified that he had been a detective assigned to fraud investigations with the PCSO for eight years, and had been employed by the PCSO

2008 when a number of individuals[5] in the Hiram area of Paulding County began reporting that their mail had possibly been stolen, and their personal identity information used to open credit card accounts. [Doc. 63 at 9-10]. After speaking with Special Agent William Tindall ("Agent Tindall") of the United States Secret Service ("USSS"), Detective Guy learned that all of the individuals reporting identity theft lived along the same mail route, information that Agent Tindall had received from Agents Nathaniel Sims ("Agent Sims") and Dominick DelMastro ("Agent DelMastro") of the United States Office of the Inspector General. [Doc. 63 at 10-11]. Agent DelMastro told Detective Guy that the United States Postal Service ("USPS") driver assigned to the route where the victims lived was named Mary Afolabi.[6]

According to Agent John David Walker ("Agent Walker") of Immigration and

---

for fifteen years. [Doc. 63 at 7]. Prior to working for PCSO, Detective Guy had been a patrol officer, in investigations, and in administration for the Marietta Police Department for 22 years. [Id.]. He testified that he had experience investigating prescription fraud, forgery, financial transaction card fraud, credit card fraud, and identity theft, estimating that in eight years he had investigated "hundreds" of such cases. [Doc. 63 at 7-8].

[5] Detective Guy estimated the number of victims to be approximately 85, and he testified that he spoke to all of them. [Doc. 63 at 10]. He also testified that this number represented a significant spike in identity theft activity in Paulding County. [Id.].

[6] Agent Tindall provided Detective Guy with a picture of the individual known to him as "Mary Afolabi" who was driving the postal route under investigation, and Detective Guy positively identified Adigun in court as the same individual shown in that picture. [Doc. 63 at 11].

Customs Enforcement, ("ICE"),[7] Mary Gibson ("Gibson"), the mother of the real Mary Afolabi, had filed a report with the CCSO after Adigun had allegedly used Mary Afolabi's identity information to obtain a fraudulent Nigerian passport, then used this passport to return to the United States.  [Doc. 63 at 13-14; Gov. Exs. 1 & 2]. During the course of Agent Walker's investigation, he reviewed Adigun's A-file, which contained all of the papers and applications related to her immigration status, and found that she had two Nigerian passports, each bearing the same picture, but with different names.[8]  See [Doc. 63 at 113-14; Gov. Exs. 1 & 2].  He also determined that Adigun had been allowed into the United States in March of 2004 under the name "Mary Kemi Afolabi" with a birth date of May 25, 1984, under a visa allowed for children of United States citizens under the age of 21. [Doc. 63 at 114, 124-25].

Agent Walker spoke to both of Mary Kemi Afolabi's parents, Mary and Lewis Gibson, and they confirmed that Mary Kemi Afolabi, their daughter, resided in London, and that the individual pictured on the passports was "Opi Adigun,"

_____

[7] Agent Walker testified that he worked for the Homeland Security Investigations division of ICE, assigned specifically to the document identification fraud task force investigating immigration fraud and the production of counterfeit identification documents.  [Doc. 63 at 112].

[8] Detective Guy also identified the fraudulent Nigerian passport, (Gov. Ex. 1), as bearing Adigun's picture, but with a name of "Mary Kemi Afolabi" and birth date of May 25, 1984.  [Doc. 63 at 14, 113].  He identified a second Nigerian passport, (Gov. Ex. 2), also bearing the same picture of Adigun, but the name "Opeoluwa Aboseda Adigun," and a birth date of December 30, 1972.  (Id.).

whom they recognized as an individual they knew and went to church with in Nigeria. [Doc. 63 at 115-16, 134]. Gibson told Agent Walker that, while in Nigeria, she had entrusted Adigun and Adigun's mother with immigration paperwork for her daughter, Mary Afolabi, because Adigun and Adigun's mother had told Gibson that they had a contact at the United States Embassy that would allow them to "rush it through the system."[9] [Doc. 63 at 116-17, 134]. Gibson said that Adigun flew to the United States in 2004, but did not bring with her any of Mary Afolabi's immigration paperwork. [Doc. 63 at 117, 134-35]. Adigun was pregnant at this time, and Gibson allowed Adigun to stay at her home until the baby was born.[10] [Doc. 63 at 117, 135]. Thereafter, Gibson flew with Adigun and Adigun's child to Nigeria, where she left both and returned to the United States with the two passports. [Doc. 63 at 117]. Gibson discovered in 2006 that there were addresses listed on her credit

---

[9] Mary Afolabi's A-file contained a "Form N-400" application for naturalization bearing the name "Mary Kemi Afolabi" and addresses of 2145 East-West Connector Road and 1234-C Natchez Trace. [Doc. 63 at 121-22]; (Gov. Ex. 17). Adigun was naturalized in the name of Mary Kemi Afolabi on March 11, 2009. [Doc. 63 at 122]; (Gov. Ex. 17). On the application form, Adigun stated that she had not ever gone by another name, and that she had not committed any crimes for which she had been arrested, both of which were factors to be considered by the Citizenship and Immigration Service personnel who processed and granted the application. [Doc. 63 at 123-24]; (Gov. Ex. 17).

[10] Agent Walker testified that Gibson's tax records from 2002 and 2004 reflected that Gibson claimed her daughter, Mary Kemi Afolabi, as a dependant on her federal and Georgia state income taxes, but that she used Adigun's social security number on the tax forms. [Doc. 63 at 120].

report that she did not recognize after someone rented an apartment in her name in Marietta, Georgia. [Doc. 63 at 117-18]. Gibson suspected that her identity had been stolen, and reported the incident to Cobb County authorities in 2007, turning in the passports as evidence at that time. [Doc. 63 at 117-18, 135].

Eight identity theft victims,[11] two in Cobb County, and six in Paulding County, who all lived on Adigun's mail route, reported that someone had taken out personal loans in their names from Chase. [Doc. 63 at 22]. Upon following up with a Chase representative, Detective Guy learned that the loan proceeds had been direct-deposited into accounts each bearing the name of a victim in whose name the loan application had been completed. [Doc. 63 at 23]. After the loan proceeds were deposited into these intermediate accounts, they were transferred to other accounts, and funds were drawn from there. [Id.]. Statements from the accounts from which funds were drawn showed charges for gasoline, electronics, and gift cards at Target, Wal-Mart, and Microcenter.[12] [Doc. 63 at 23-24].

_____

[11] Detective Guy said that a JP Morgan Chase bank ("Chase") representative had informed him that ten loans had been applied for, but two of them had been stopped, leaving only eight funded loans and eight victims. [Doc. 63 at 22].

[12] Detective Guy said that he particularly remembered charges being made at the Target and Wal-Mart stores at "East-West Connector" in Cobb County, and at the QT gas station at Powder Springs and Sandtown Road in Marietta. [Doc. 63 at 24]. Detective Guy testified that these locations were approximately a mile from the Natchez Trace addresses in Marietta associated with Mary Afolabi.

Another victim, Nancy Mintz ("Mintz"), who also lived on Adigun's mail route, filed a report with Detective Guy in January of 2009 after she discovered that an unknown individual had used her identity information to open a total of nine accounts at BB&T bank ("BB&T"), including savings, checking, and credit card accounts.  [Doc. 63 at 14, 20, 23].  According to Mintz, she had never banked with BB&T.  [Doc. 63 at 20].  Detective Guy followed up with Investigator Tom McKoy ("Investigator McKoy") of BB&T who told him that someone calling themselves Nancy Mintz had bought a Jeep automobile for $6,000.00 at G.M.O. Sales ("G.M.O."), a sales lot located at 4263 Bankhead Highway in Douglasville, Georgia. [Doc. 63 at 15-16]; (Gov. Exs. 3 & 4).  Investigator McKoy went to the dealership to obtain a copy of the bill of sale, and provided that to Detective Guy.[13]  [Doc. 63 at 15].  Detective Guy asked an auto theft detective to check the serial number listed on the bill of sale, and the auto theft detective informed him that no vehicle was associated with that serial number.  [Id.].  Investigator McKoy also provided Detective Guy with a copy of a Virginia driver's license bearing the name Nancy Mintz, but the person whose picture appeared on the license was someone other

---

[13] Investigator McKoy told Detective Guy that initially the person he spoke to at G.M.O., a man named "Gabriel," could not provide him with a copy of the bill of sale, but when he returned an hour later, he provided him with one.  [Doc. 63 at 15-17].  Detective Guy said that he had obtained a business card for "Gabriel Onyekaba" with G.M.O.'s business name and Bankhead Highway address on it. [Doc. 63 at 17].

than the Nancy Mintz who had filed the report.[14]  [Doc. 63 at 15, 92-93].  Detective

Guy also received copies of checks drawn on a BB&T account in the name of Nancy

Mintz bearing an address of 1305-B Natchez Trace, Apartment B, Marietta, Georgia,

that were written out to and processed through G.M.O., and bore an endorsement

on the back of "M. Afolabi."  [Doc. 63 at 15, 18-19]; (Gov. Exs. 5 & 6).  Mintz told

Detective Guy that she had never been to G.M.O. and had never purchased a car

there.  [Doc. 63 at 20-21].

Detective Guy followed up with the Georgia Secretary of State and found that

the business license on file for G.M.O. showed that G.M.O.'s registered agent and

owner of the sales lot was Mary Afolabi.  [Doc. 63 at 15-16]; (Gov. Exs. 3 & 4).

Detective Guy reviewed bank account records associated with Mary Afolabi and

G.M.O. obtained by the USSS, and estimated that deposits into these accounts were

between six and ten thousand dollars per month.  [Doc. 63 at 25].  Detective Guy and

other USPS investigators began conducting surveillance of the G.M.O. auto sales

location on Bankhead Highway using a USPS pole camera set up for this purpose.[15]

[Doc. 63 at 17-18, 60, 89-90].  During the time he was monitoring G.M.O., Detective

---

[14] Detective Guy confirmed with the Virginia drivers' services department that no "Nancy Mintz" with the same information existed in their systems.  [Doc. 63 at 59].

[15] Detective Guy explained that he could monitor the images broadcast by the pole camera in real time on his computer through an internet site.  [Doc. 63 at 89-90].

14

Guy did not see any auto sales activity, and only saw cars in front of the location that never changed, and the "owner" of the property coming to clean up.[16]  [Doc. 63 at 18].  Detective Guy also determined that Mary Afolabi had provided an address of 1305-B Natchez Trace in Marietta, Georgia, on her USPS employment application.  [Doc. 63 at 19-20]; (Gov. Ex. 7).  He also requested driver's license information from the Georgia Department of Driver's Services for Mary Afolabi, and received a printout of a license bearing the name "Mary Kemi Afolabi," an address of 1337 Natchez Trace, Apartment A, Marietta, Georgia,[17] and a picture that Detective Guy identified as Adigun's.  [Doc. 63 at 21]; (Gov. Ex. 8).

Vigil Cheney, another victim on Adigun's mail route, reported that on February 23, 2010, someone had made an unauthorized purchase of over $7,000 at the Wal-Mart store in Paulding County on Dallas Highway using a line of credit that he was not aware existed.  [Doc. 63 at 25-26].  Approximately $3,000 of the amount purchased was for gift cards, and the remainder was for electronic merchandise.  [Doc. 63 at 25].  Detective Guy obtained from Missy Lott ("Lott") of Wal-Mart loss

---

[16] He testified that other investigators who were monitoring the pole camera had not seen any auto sales activity either, though he testified that he had another victim, Chad Peppers, who said his identity had been used in connection with fraudulent charges at G.M.O.  [Doc. 63 at 90-92].

[17] Detective Guy testified that throughout the course of the investigation, he "repeatedly" encountered different addresses on Natchez Trace in the 1300 and 1200 buildings.  [Doc. 63 at 21-22].

prevention surveillance photos of the individual who made the unauthorized purchases. [Doc. 63 at 26-27, 81]; (Gov. Ex. 9). Detective Guy compared this photograph to a booking photograph of Onyekaba obtained from the CCSO, (Gov. Ex. 10), and concluded that the individual in the surveillance photograph wearing a hat was Onyekaba.[18] [Doc. 63 at 27-28].

Shannon Fritz ("Fritz"), who also lived on Adigun's mail route, told Detective Guy that someone had used her personal information without her permission to register three businesses in her name with the Georgia Secretary of State's office. [Doc. 63 at 28]. Fritz told Detective Guy that she believed the information had been obtained from a credit card that she was supposed to have received in the mail, but did not. [Id.]. Detective Guy ascertained that the charges to register the businesses had been made to a credit card in Fritz's name on or about February 13, 2010. [Doc. 63 at 28-30]; (Gov. Ex. 11). The three businesses registered were Burtz Moving, Incorporated, Jame Tire, Incorporated, and Donchez Transportation, Incorporated. [Doc. 63 at 29]; (Gov. Ex. 11). The address listed as the business address for Burtz Moving, Incorporated, was 1300 Natchez Trace, Marietta, Georgia. [Doc. 63 at 30];

---

[18] The surveillance photographs obtained from Lott showed only a male subject, and did not show Adigun. [Doc. 63 at 62]. Detective Guy testified that he showed the booking photograph of Onyekaba and a surveillance photograph from Wal-Mart to Lott and other investigators, and they believed the same individual was depicted in the two pictures. [Doc. 63 at 81-82].

(Gov. Ex. 11).    The address listed as the business address for Donchez Transportation, Incorporated, was 184 Champion Way, Hiram, Georgia, which Detective Guy testified was on Mary Afolabi's postal route.  [Doc. 63 at 30].

### 2.    *March 6, 2010, Traffic Stop*

Detective Guy, Agent DelMastro, Officer Keith Bowles ("Officer Bowles") of the Hiram Police Department ("HPD"),[19] Detective Jason Walden ("Detective Walden") of HPD, Agent Walker, and Special Agent Kevin Arline ("Agent Arline") of ICE participated in a traffic stop of defendants on March 6, 2010.[20]  [Doc. 63 at 31, 104, 111, 121, 131-32].  Detective Guy testified that "Detective Leatherman" of the Douglas County Sheriff's Office ("DCSO") had obtained a warrant for Adigun's arrest under the name "Mary Afolabi" on charges of identity fraud in Douglas County.[21]  [Doc. 63 at 31, 53-54]; (Gov. Ex. 12).  The participating law enforcement

---

[19] Officer Bowles testified that he worked for HPD as a patrol officer, and had done so for five years.  [Doc. 63 at 94].  On March 6, 2010, he was on regular patrol before assisting with the stop of defendants.  [Doc. 63 at 104].

[20] The government submitted a video recording of the traffic stop as Exhibit 16, and it was played during Detective Guy's testimony at the July 28, 2010, hearing.  See [Doc. 63 at 47-52]; (Gov. Ex. 16).  References to particular sections of this recording will be cited according to the time marker displayed on-screen, e.g., (Gov. Ex. 16 at 7:20).

[21] On cross-examination, Detective Guy testified that the warrant was issued the day before the traffic stop on March 5, 2010, by a Douglas County judge and that he did not participate in the acquisition of that warrant.   [Doc. 63 at 53-54].

17

officers met at HPD to coordinate surveillance of Adigun, and to plan execution of the arrest warrant. [Doc. 63 at 31-32, 104, 131-32]. Detectives Walden and Guy set up across the street from the USPS office where they expected Adigun to return after she finished her postal route.[22] [Doc. 63 at 32]. Agents Walker and Arline were parked down the street from the post office, but out of sight of the post office. [Doc. 63 at 31-32]. Officer Bowles, who had been instructed to stop the vehicle Adigun was traveling in, was also positioned up the road. [Doc. 63 at 33, 94, 104-05].

At approximately 2:00 p.m., the officers surveilling the post office saw Adigun drive her postal truck into the USPS lot, park it, and go inside the building. [Doc. 63 at 32]. After approximately a minute, Adigun walked back out of the building carrying a purse, and got into the passenger side of the Navigator[23] driven by an individual Detective Guy identified in Court as Onyekaba. [Doc. 63 at 32-33, 63]. Officer Bowles got behind Onyekaba after Onyekaba passed his position, and

---

[22] Agent DelMastro was positioned in another location across the street from the USPS office, also waiting and watching for Adigun to return. [Doc. 63 at 32].

[23] During the hearing, law enforcement officers and counsel referred to the vehicle stopped both as a Lincoln Navigator and a Ford Expedition. See [Doc. 63 at 32-33, 63, 87, 131]. The video recording of the stop establishes that it was, in fact, a Lincoln Navigator, and the VIN for the vehicle described in the warrant obtained by Investigator Meeks, 5LMFU27R13LJ35983, was the same as the VIN of the vehicle stopped on March 6, 2010. See [Doc. 49-2 at 4]; (Gov. Ex. 16 at 17:16, 20:30). Therefore, the Court will refer to the vehicle as "the Navigator."

activated his blue lights to stop the vehicle.[24]  [Doc. 63 at 33, 94, 104-05].  The other law enforcement officers were behind Officer Bowles in their vehicles when he made the stop.  [Doc. 63 at 33, 94].

Onyekaba went across a set of railroad tracks and pulled off of the roadway after the tracks.  [Id.].  After Onyekaba stopped, Officer Bowles walked up to Onyekaba's window and began talking to him.  [Id.].  At this time, Detective Guy could see Adigun's shoulders and hands moving while she was seated in the car, and he remarked to another officer that it "looks like she's trying to get rid of something."[25]  [Doc. 63 at 33-34; 49-50]; (Gov. Ex. 16 at 7:20).  Detective Walden approached the passenger side of the vehicle and asked Adigun for her license, [Doc. 63 at 34-35, 64], and she produced a license in the name of "Mary Kemi Afolabi," with an address of 1305-B Natchez Trace in Marietta, Georgia.  (Gov. Ex. 8; Gov. Ex. 16 at 4:47, 5:50).  Because the date of birth on the license did not match

---

[24] Detective Guy testified that the reason the stop was made on the Navigator after Adigun left the USPS office was that they wanted to arrest her "off the postal property."  [Doc. 63 at 56].  He said another reason was that they wanted to have a chance to search her vehicle because they did not have a warrant for it.  [Id.].

[25] Detective Guy testified that it looked as though she was "in her pocketbook moving stuff around," and based on his training and experience, her movements were consistent with someone attempting to hide evidence during a traffic stop.  [Doc. 63 at 33-34].  Detective Guy testified that he had been on "hundreds" of traffic stops, and that in previous traffic stops he had been involved with, individuals making similar movements were in fact hiding evidence.  [Doc. 63 at 34].

the date of birth on the arrest warrant, Detective Walden called his dispatch center

to confirm that the warrant was valid. [Doc. 63 at 95]. Once Detective Walden's

dispatch center confirmed that the warrant was valid, he asked Adigun to step out

of the vehicle. [Doc. 63 at 34-35, 64, 95-96]. He then walked her to the back of the

vehicle and advised her that she was under arrest. [Doc. 63 at 35].

Detective Guy asked Adigun if she wanted her purse, and she said, "Yes,

please." [Doc. 63 at 35, 50, 71]; (Gov. Ex. 16 at 13:55). When Detective Guy

approached the Navigator to get Adigun's purse, which was on the seat or

floorboard on the passenger side, he observed that her wallet[26] was laying open on

the center console, facing toward the passenger side. [Doc. 63 at 35, 50-51]; (Gov. Ex.

16 at 14:17). Before entering the vehicle to retrieve the purse, Detective Guy noticed

that the wallet was "full" of cards, with all the slots for cards on both sides being

filled.[27] [Doc. 63 at 35-36]. He also saw "items like pieces of paper . . . thrown out

---

[26] Detective Guy described the wallet as a "woman's folding bifold" that was "probably four inches on each side folded," with slots on both sides for cards. [Doc. 63 at 38].

[27] Detective Guy testified that he later counted the number of cards in the wallet, and there were 26 or 28. [Doc. 63 at 36]. He also testified that he could see the wallet open on the center console from outside of the vehicle, and he could also see that there were a large number of cards inside it, something that, based on his training and experience, was consistent with credit card fraud and identity theft, and was "highly unusual" for a person not engaged in criminal activity. [Doc. 63 at 36-37]. He said that once he picked up the wallet, he could see that the wallet contained at least two Target cards. [Doc. 63 at 36].

in the floorboard and around the pocketbook," so he took these items and put them back into Adigun's purse.  [Doc. 63 at 35, 39].  He also folded up the wallet, and put it back into Adigun's purse.  [Doc. 63 at 35, 39-40].

Officer Bowles ran the dealer license plate on the Navigator and found that it was registered to G.M.O.  [Doc. 63 at 97, 107].[28]  Officer Bowles also ran the VIN and found that it was registered to Mary Afolabi.  [Doc. 63 at 98].  Detective Guy told Officer Bowles that G.M.O. was no longer in business, so Officer Bowles called a supervisor to determine what he should do with the dealer's plate since it could only be legally used while conducting dealership business.  [Doc. 63 at 98, 107].  Ultimately, Officer Bowles issued Onyekaba a citation for improper use of the dealer's plate.  [Id.].

Upon initially contacting Onyekaba, Detective Walden or Officer Bowles asked him for consent to search the vehicle, and Onyekaba refused.  [Doc. 63 at 40, 73, 82-83].  Officer Bowles told Onyekaba that the officers were going to search anyway, because they had an arrest warrant for Adigun.[29]  [Doc. 63 at 50, 73-74, 99];

---

[28] Detective Guy testified that he had previously seen the same vehicle on more than one occasion parked at the G.M.O. lot, but did not know who it was registered to or if it was offered for sale at the G.M.O. lot.  [Doc. 63 at 63].

[29] Officer Bowles testified that this was his understanding of the law at the time of the stop, and that he learned approximately a week later during a shift change meeting that a new Supreme Court case had changed the standard.  [Doc. 63 at 99].

(Gov. Ex. 16 at 11:20).  After getting Adigun's purse from the car, Detective Guy had

a conversation with Onyekaba and told him who the law enforcement officials

present at the stop were: that two officers were there from HPD, one was there from

the USPS, that he was from PCSO, and that two agents from "ICE, immigration"

were present.[30]  [Doc. 63 at 40, 51-52, 75-76]; (Gov. Ex. 16 at 15:33).  Detective Guy

told Onyekaba, "it might be in your best interest to cooperate with this

investigation," whereupon Onyekaba replied, "Okay."  [Doc. 63 at 40].  Detective

Guy then said, "You mean they can search?" and Onyekaba replied, "Yeah."[31]  [Id.].

_____

[30] At the time Detective Guy told Onyekaba the identities and affiliations of
all of the law enforcement present, Officer Bowles and Detective Walden were "to
the rear on the driver's side" of the vehicle, Agent DelMastro was on the passenger
side, Detective Guy was next to the rear of the patrol car standing with Onyekaba,
and the ICE agents were standing behind Detective Guy.  [Doc. 63 at 40].  Detective
Guy testified that it was "not uncommon for [him] to stand with somebody and
explain when you've got a number of officers standing around to tell [the detainee]
who is there." [Doc. 63 at 41].  He also testified that he was not aware that Onyekaba
was not a United States citizen, and believed, but was not sure, that he had learned
from ICE agents prior to the stop that he was lawfully residing in the United States.
[Doc. 63 at 76, 84-85].  Agent Walker testified that Onyekaba was in the United States
on a "DV-1" visa and that during the stop, he requested a criminal history check
which revealed that Onyekaba had three prior felony arrests, but no conviction, for
forgery, financial transaction fraud, and financial identity fraud in 2007 and 2008.
[Doc. 63 at 126-28].

[31] Detective Guy testified that at the time he had this exchange with Onyekaba,
he was standing with his arms crossed, did not have his gun drawn, did not make
any promises, and used a normal tone of voice.  [Doc. 63 at 41].  He said that
Onyekaba appeared calm, appeared to understand the conversation, was not
handcuffed, was never arrested or physically restrained, and that Onyekaba left the

Detective Guy then called Detective Walden and Officer Bowles over and told them that Onyekaba would give him permission to search, whereupon Officer Bowles asked if the officers could search the vehicle, to which Onyekaba said, "Yes."[32] [Doc. 63 at 40, 51-52, 78-79, 87-88, 100, 108]; (Gov. Ex. 16 at 19:09). Officer Bowles testified that when he asked for consent to search, none of the officers had their guns drawn, no one made any threats or promises to Onyekaba, and the tone of the question was "conversational." [Doc. 63 at 101]. Officer Bowles described Onyekaba's demeanor as "calm," and testified that he seemed to understand what was being said to him. [Id.].

Officer Bowles and Detective Walden searched the Navigator and found a total of fifteen one-hundred dollar American Express and Wal-Mart gift cards.[33] [Doc. 63 at 42, 44, 102-03; Gov. Exs. 13-14]. Detective Guy inventoried Adigun's purse and pocketbook when she was booked into Douglas County jail. [Doc. 63 at 45]. In addition to 26 or 28 credit cards and gift cards in the pocketbook, he found

---

scene of the stop by driving the vehicle away. [Doc. 63 at 41-42, 89].

[32] Detective Guy testified that the reason he called Detective Walden and Officer Bowles over to get Onyekaba's permission to search was that one of the HPD officers was wearing a recording device. [Doc. 63 at 41, 100].

[33] Later investigation by Agent DelMastro revealed that the gift cards were purchased using information from one of the victims on Mary Afolabi's mail route. [Doc. 63 at 43].

moneygram receipts to a Margaret Adigun in Nigeria from "Opi Adigun" in amounts from one hundred to seven hundred dollars.  [Doc. 63 at 45]; (Gov. Ex. 15).

### 3.    *Search of G-Rock Restaurant*

On or about August 3, 2010, Detective Guy contacted James Tabb ("Tabb"),[34] the owner of a building Adigun leased to operate G-Rock restaurant.[35]  [Doc. 110 at 2-11, 42, 70].  Tabb testified that he had leased the property where G-Rock restaurant was located to an individual named "Mary K.Afolabi," who he identified in Court as Adigun, on December 19, 2008, for $2,300.00 per month.[36]  [Doc. 110 at 2-11]; (Gov.

---

[34] Tabb testified that he owned approximately 18 rental properties, including the building housing G-Rock restaurant.  [Doc. 110 at 5].

[35] Before talking to Detective Guy, Tabb called the Federal Bureau of Investigation, the USSS, and PCSO to request that an officer come with him to enter the property because he believed it was abandoned, and he was "afraid to go in" without law enforcement present.  [Doc. 110 at 41, 67-68].  Detective Guy got Tabb's contact information from Cobb County Police Department Detective John Freelander.  [Doc. 110 at 42, 70].

[36] On the application, Adigun wrote that the name of her business was "G.M.O. Auto Services, L.L.C.," but she and Tabb discussed that she would be opening a restaurant, and that the property would need renovations to this end.  [Doc. 110 at 7, 9]; (Gov. Ex. 2).  Adigun provided an address of 1244-C Natchez Trace in Marietta, Georgia on the application, and Tabb understood that this was the address to which he would need to send correspondence related to eviction.  [Id.].  However, in addition to sending correspondence to this address, Tabb also posted letters on the door of the restaurant, and mailed them to other addresses on Natchez Trace, one of which he had found on the internet: 1337 Natchez Trace, Apartment A and 1244-C Natchez Trace.  [Doc. 110 at 33-35, 64]; (Gov. Exs. 10-11).  Though he did not know if Adigun ever received these letters, he assumed that she did based on the fact that he received responses to some of them.  [Doc. 110 at 52, 65].  On

24

Exs. 1 & 2). Tabb told Detective Guy that he had evicted the tenants of G-Rock restaurant and was getting ready to clean it out and throw away the contents.[37] [Doc. 110 at 70-71]. Detective Guy had not had any previous contact with Tabb, and knew nothing about his ownership of the building.[38] [Doc. 110 at 71]. Detective Guy

---

August 3, 2010, Tabb posted a notice on the door of the restaurant that the lease had been terminated and that the tenants "were not to have access after that point." [Doc. 110 at 42-43]; (Gov. Ex. 12). He also changed the locks the week after August 3, 2010, and informed Adigun over the phone on two occasions that she could no longer enter the building or operate the restaurant, and that he intended to keep the equipment she had left there. [Doc. 110 at 44, 47-48, 68-69].

[37] Tabb was questioned at some length about whether he had legally evicted Adigun, and he admitted he did not follow O.C.G.A. § 44-7-50. See [Doc. 110 at 53-54]. He testified that between March of 2008 and the time of her arrest in May of 2010, Adigun "almost never" paid her rent on time, and would go three or more months in arrears, but that he would allow her to catch up after writing several letters with increasingly threatening language, culminating in a "formal demand letter to let them know that they . . . would be evicted." See [Doc. 110 at 15-24, 28]; (Gov. Exs. 2-8). See also [Doc. 110 at 58-61]. The last such letter, sent in February of 2010, stated that Adigun was five months in arrears, and that if rent were not received within five days after receipt of the letter, the lease "will be declared to be in default." [Doc. 110 at 28]; (Gov. Ex. 9). However, Tabb did not ever declare the lease in default, or file any action in Cobb County to dispossess Adigun. [Doc. 110 at 28, 32, 63]. Adigun presented evidence at the February 3, 2011, hearing that there was no record of any dispossessory action filed in Cobb County court against her. [Doc. 110 at 91]; (Def. Ex. 8).

[38] Detective Guy testified that he had no involvement with Tabb evicting the tenants of G-Rock restaurant, had not told him to do so, and had not suggested that sending letters or evicting the tenants would be a way for law enforcement to get into the restaurant. [Doc. 110 at 72-73]. Tabb testified that law enforcement officers he had contacted, and possibly Detective Guy, had told him that they wanted Tabb to "gain possession" before they would go into the building with him. [Doc. 110 at 41]. Detective Guy said that on the day they met, Tabb told him that he and his son

responded to G-Rock restaurant and met with Detective Donnie Pace ("Detective

Pace") of PCSO . [Doc. 110 at 42, 71].  Tabb was waiting for Detectives Guy and Pace

at the front door of the restaurant.  [Doc. 110 at 42, 72].  Tabb unlocked the door and

Tabb, Detective Guy, and Detective Pace entered G-Rock restaurant and began to

"look[] around."  [Id.].  Detective Guy described the restaurant as "a big open room

with a platform" with "two rooms in the back," one of which was locked.  [Doc. 110

at 72].  He testified that the restaurant was in disarray, with items thrown behind the

bar and on the floor.[39]  [Id.].

---

were the property owners, that Tabb "had possession," and that Tabb had evicted
the tenants for non-payment of rent.  [Doc. 110 at 42, 73, 83-84].  Tabb did not show
Detective Guy a copy of the lease, or any court or law enforcement documentation
regarding eviction, though he did show Detective Guy a letter that he had sent to
Adigun.  [Doc. 110 at 83-84].

[39] Inside the restaurant were a sofa, a 32 inch LCD television on the wall, three
or four bar chairs in the bar area as well as a few in the main seating area, and liquor
displays on the wall.  [Doc. 110 at 74].  Otherwise, the restaurant was vacant, and
there was "nothing on the walls," though Detective Guy opined that it "looked like
there was a large screen T.V. that had been removed from the wall."  [Doc. 110 at
74-75].  Tabb testified that he had been inside the restaurant several times prior to
May of 2010, and it appeared at those times to be an operating restaurant.  [Doc. 110
at 21-22, 39].  Tabb said that he saw a news report about defendants being arrested
for identity theft and postal theft in May 2010, and he was aware that Adigun was
in jail after this time, though he did receive a phone call from Adigun in May or June
during which she told him she was innocent and had just had a baby.  [Doc. 110 at
14-15, 29-30].  He testified that after May 18, 2010, there were three cars on the
property, two of which remained for a month before "they disappeared," and the
last of which remained until September 2010, when Tabb had it towed.  [Doc. 110 at
39].  The phone line, power, water, and natural gas service to G-Rock restaurant
were disconnected as of June 2010.  [Doc. 110 at 39, 65-66].  On August 3, 2010, the

On August 3, 2010, Detective Guy took only a checkbook that was on the bar marked as "G-Rock Investments," as well as several brochures for "Cumming Entertainment."[40]   [Doc. 110 at 75]; see also [Doc. 110 at 44].   Detective Guy saw several other papers around the bar area that looked like receipts, contract agreements, and other miscellaneous paperwork.   [Doc. 110 at 75].   He also saw three credit card machines, phones, and videos laying on the floor in the bar area on and around a small table.   [Doc. 110 at 75-76].   He testified that it "looked like it had been gone through," and that "stuff was just strewn everywhere behind the bar [on] the floor."   [Doc. 110 at 76].   See also [Doc. 110 at 43, 66].   Tabb unlocked the room in the back using his own key without either Detective Guy or Pace asking him to do so.   [Doc. 110 at 72, 74, 77, 89].   The back room was partially unfinished, and unventilated, and inside were wooden storage shelves and a desk upon which was a box of paperwork and other items.   [Doc. 110 at 77-78, 88].

---

signage for G-Rock restaurant was still up, including window decals and posted business hours, though Tabb later removed them.   [Doc. 110 at 57]; see also (Def. Exs. 1-7).

[40] Detective Guy testified that because it was over one hundred degrees inside the building, it was too uncomfortable to search for any length of time, so he coordinated with Tabb to return on August 6, 2010. [Doc. 110 at 43, 79].

On August 6, 2010, Detective Guy returned to G-Rock restaurant accompanied by Agent DelMastro, and Tabb again unlocked the front door using his key.[41] [Doc. 110 at 44-45, 79-80]. On this occasion, Agent DelMastro seized credit card receipts, credit cards, credit card machines, cell phones, a video from around the bar area, and paperwork related to G.M.O. that came out of the back room. [Doc. 110 at 80-81]. See also (Def. Ex. 10). Detective Guy estimated that the entire search took around 45 minutes to an hour. [Doc. 110 at 80]. Detective Guy never returned to G-Rock restaurant, though Tabb called him a third time saying he had found something suspicious inside that looked like narcotics. [Doc. 110 at 45-46, 81-82]. Agent DelMastro met with Tabb and determined that the item Tabb found was not narcotics. [Id.]. On this third trip, Agent DelMastro also took an additional credit card machine that Tabb had found. [Doc. 110 at 46-47].

## II. DISCUSSION

At the outset of the July 28, 2010, hearing, the parties stipulated in open court that Adigun's first statement made to a United States Postal Inspector and a PCSO

---

[41] Detective Guy testified that Tabb again let the law enforcement officers in by opening the door with his own key, without them asking him to do so. [Doc. 110 at 79-80]. Tabb testified that he entered first, and that he, Detective Guy, and Agent Delmastro "went through just about the entire building." [Doc. 110 at 45]. Tabb said that he would have done this himself if Detective Guy had not agreed to return, and that he would have turned over anything he found to the police that he believed to be evidence. [Id.].

deputy after she was arrested on March 6, 2010, pursuant to the Douglas County warrant was admissible, but her statements made in the subsequent days to an ICE agent and to a DCSO employee were not admissible.  [Doc. 63 at 3-4].  Accordingly, it is **RECOMMENDED** that Adigun's motion to suppress the statements made after her March 6, 2010 arrest, [Doc. 31], be **DENIED** as moot.

The government also stipulated that it would not use during its case in chief two passports seized when Adigun was arrested on May 12, 2010, though it reserved the right to prove through government records that she had two passports.  [Doc. 63 at 4].  See also [Doc. 63 at 113].  At the conclusion of the hearing, Adigun partially withdrew her motion to suppress statements following her May 12, 2010, arrest with regard to the statement Agent Walker testified about at the hearing, and the government agreed not to offer any other statements.  [Doc. 63 at 5, 145, 147]. Accordingly, it is **RECOMMENDED** that Adigun's motion to suppress evidence and statements arising from her May 12, 2010, arrest, [Doc. 30] be **DENIED** as moot. Thus, the remaining issues to be addressed by the Court pertain to the motion to sever, the 2007 search warrant for the Navigator, the warrantless search of the Navigator following Adigun's arrest on March 6, 2010, and the warrantless searches of G-Rock restaurant.  [Doc. 63 at 5, 145]; [Docs. 29, 32, 37, 42, 46, 49, & 73].

## A.   Adigun's Motion to Sever Counts 27, 28, and 29, [Doc. 29]

Adigun moves the Court to sever the immigration fraud, social security fraud,

and passport fraud charges in Counts 27, 28, and 29 from the remaining charges in the indictment.   [Doc. 29].   Adigun's motion requires the Court to undertake a two-step analysis. United States v. Hersh, 297 F.3d 1233, 1241 (11th Cir. 2002) (citing United States v. Walser, 3 F.3d 380, 385 (11th Cir. 1993)).   First, the Court must determine whether joinder of charges was proper under Federal Rule of Criminal Procedure 8(a).  Id. See also United States v. Shuler, 373 Fed. App. 949, 953 (11th Cir. 2010) (per curiam) (unpublished).  If the charges were properly joined, the Court must then determine whether severance is required by Federal Rule of Criminal Procedure 14. Id. (citing Hersh, 297 F.3d at 1241); see also United States v. Campbell, Criminal Action No. 1:04-CR-0424-RWS, 2005 WL 6436622, at *2-3 (N.D. Ga. July 7, 2005), adopted at *1.   For the following reasons, the Court finds that joinder is proper under Rule 8, and severance is not merited under Rule 14.

### 1.      *Joinder is proper under Rule 8*

"Joinder of parties and defendants under Rule 8 is designed to promote judicial economy and efficiency."  United States v. Weaver, 905 F.2d 1466, 1476 (11th Cir. 1990). "Rule 8 'is broadly construed in favor of the initial joinder.'"  Id. (citation omitted).  See also Zafiro v. United States, 506 U.S. 534, 537 (1993) ("There is a preference in the federal system for joint trials of defendants who are indicted together."); Hersh, 297 F.3d at 1241; United States v. Touchet, No. 3:07-cr-90-J-33HTS, 2008 WL 2025322, at *7 (M.D. Fla. May 9, 2008); United States v.

30

Cameron, No. 06-20753-CR, 2007 WL 1696022, at *3 (S.D. Fla. June 12, 2007), adopted at *1 (quoting United States v. Dominguez, 226 F.3d 1235, 1238 (11th Cir. 2000)). "When multiple defendants are indicted, joined offenses must be reviewed initially under the standard set forth under Fed.R.Crim.P. 8(b)." United States v. Jones, No. CR 109-073, 2009 WL 2920894, at *1 (S.D. Ga. Sept. 11, 2009) (citations omitted). "[J]oinder under Rule 8(b) is to be determined before trial by examining the allegations contained in the indictment." United States v. Morales, 868 F.2d 1562, 1567 (11th Cir. 1989).

Adigun argues that under Rule 8(a),[42] the immigration offenses are not of the

---

[42] Though Adigun cites Rule 8(a) as the basis of her motion, reliance on Rule 8(a) is only proper in cases involving a single defendant. United States v. Kopituk, 690 F.2d 1289, 1312 (11th Cir. 1982) (collecting cases). Rule 8(b) is the proper rule to use when seeking severance in cases involving multiple defendants. Id. Nonetheless, whether proceeding under Rule 8(a) or Rule 8(b), the analysis in this case is "more or less the same" because, as discussed infra, the passport and immigration offenses "arise out of a series of acts or transactions" and are linked together as part of a larger plan or scheme. Id. Furthermore, joinder under Rule 8(a) would be proper since "Rule 8(a) allows joinder of offenses against a single defendant that 'are of the same or similar character,' even if such offenses do not arise out of the same series of acts or transactions." Walser, 3 F.3d at 385 (quoting Kopituk, 690 F.2d at 1315). "[S]imilar character . . . means nearly corresponding; resembling in many respects; somewhat alike; having a general likeness." Id. (internal marks and citation omitted). Though the passport and immigration fraud offenses are not identical to the identity theft and credit card offenses, they are of a similar nature in that they allege that Adigun used the name of another to gain benefits to which she was not otherwise entitled (e.g., the right to immigrate to the United States as a child of a United States citizen under 21 years old, and the right to work in the United States), and to incur debts and liabilities under the leases and contracts she signed to conduct her businesses in the name of another. See id.

"same or similar character" as the other offenses charged in the indictment because they are "different species of crime," and because they are not part of a "common scheme or plan" with the other offenses.  [Doc. 29 at 3].  The Court disagrees.  The offenses Adigun seeks to sever are premised on allegations that Adigun misappropriated the identity of Mary Kemi Afolabi, and used this identity to obtain a passport, immigrate to the United States, and obtain employment with the USPS. See [Doc. 1 at 2-3].  Adigun's assumption of Mary Kemi Afolabi's name and legal status allowed her to obtain her postal service employment, which was how she allegedly began stealing identity information from the mail.  See [id.].  Adigun also used the name Mary Kemi Afolabi to set up at least two businesses, as well as bank and credit accounts that were used to further the alleged fraud and identity theft offenses.  See [id. at 3-5].  Throughout the investigation, the name Mary Kemi Afolabi was associated with the identity theft, fraud, and credit card offenses being investigated and was used in furtherance of a larger plan or scheme as an additional layer of deception to distance Adigun's actual identity from the offenses she is accused of committing.  Therefore, the passport, immigration, and social security card fraud charges are "in the same series of acts or transactions, constituting an offense or offenses."  Fed. R. Crim. P. Rule 8(b).  See also Walser, 3 F.3d at 386 (holding that perjury and  false and fraudulent statement charges were properly joined because "[defendant's] deliberate falsehoods, and the necessity for covering

32

them up, led to the perjury charge."); <u>United States v. Jarrard</u>, Criminal Action No.:7:05-cr-21 (HL), 2006 WL 2982885, at *2 (M.D. Ga. Oct. 17, 2006) ("[I]t is clear from the face of the indictment that the crimes alleged in Counts Two through Fifteen are part of a common scheme or plan. The indictment alleges proceeds from [allegedly unrelated] loans obtained by [two conspirators] and proceeds from the loans obtained by [the defendants] were diverted into the same bank accounts rather than being used for the purpose stated on the corresponding loan application.").

Adigun's reliance on <u>United States v. Diaz-Munoz</u>, 632 F.2d 1330 (5th Cir. 1980),[43] is misplaced because in that case, severance was warranted due to the fact that "[a]t trial . . . the government failed to produce any evidence tending to prove a connexity between the tax counts and the non-tax counts, and even conceded this point at oral argument."  <u>Kopituk</u>, 690 F.2d at 1313 (citation omitted).  Here, the government has shown connection between the offenses, and has contested rather than conceding Adigun's claim that the charges are not connected.  Adigun also cites <u>Weaver</u>, in which joinder of charges related to cocaine and marijunana conspiracies was found to be improper because they "did not overlap temporally." [Doc. 29 at 4 (quoting 905 F.2d at 1477)].  While the passport, social security, and immigration fraud offenses were "completed" before the other offenses allegedly

---

[43] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

occurred, Weaver is also distinguishable because, in this case, Adigun continued to use the identity and legal status of Mary Kemi Afolabi to facilitate commission of the other offenses, whereas in Weaver, "the cocaine conspiracy did not begin until the marijuana conspiracy had ended."[44]   Additionally, since she used the name Mary Kemi Afolabi while allegedly committing other offenses, evidence tending to prove the immigration, passport, and social security fraud violations would also tend to prove Adigun's identity as the perpetrator of the other charged offenses.  See Morales, 868 F.2d at 1570 ("The facts underlying [the charged offense] in Counts I and II and [defendant's charged offense] in Count V are so closely connected that there would be an overlap of proof if the offenses were tried separately.").  Thus, joinder under Rule 8 is proper.

### 2.   *Severance is not warranted under Rule 14*

Although joinder is appropriate under Rule 8, the Court still has discretion under Rule 14(a) of the Federal Rules of Criminal Procedure to sever the offenses and order separate trials if it appears that consolidation of the charges would prejudice Adigun.  Fed. R. Crim. P. 14(a); Kopituk, 690 F.2d at 1314-15.  "[A]

---

[44] Moreover, the analysis in Weaver centered on prejudice to the defendants charged only in relation to the cocaine conspiracy, given that "although eleven of the twenty-one defendants charged in the cocaine conspiracy were also charged in the marijuana conspiracy in the initial indictment, only two of the nine remaining defendants went to trial with regard to the marijuana conspiracy." 905 F.2d at 1477. The instant case presents no such danger to Adigun, given that she, not her codefendant, is charged with the offenses that she argues ought to be severed.

Defendant seeking severance [must] demonstrate specific and compelling prejudice arising from a joint trial," and "[t]he level of prejudice claimed by the party seeking severance must amount to 'fundamental unfairness.'"  United States v. Denmark, No. 205CR71FTM33DNF, 2005 WL 2755987, at *2 (M.D. Fla. Oct. 25, 2005) (citing United States v. Leavitt, 878 F.2d 1329, 1340 (11th Cir. 1989); United States v. Knowles, 66 F.3d 1146, 1159 (11th Cir. 1995)).  "The test for assessing compelling prejudice is whether under all the circumstances of a particular case it is within the capacity of jurors to follow a court's limiting instructions and appraise the independent evidence against a defendant solely on that defendant's own conduct in relation to the allegations contained in the indictment and render a fair and impartial verdict."  Hersh, 297 F.3d at 1243 (quoting Walser, 3 F.3d at 386-87) (internal marks omitted).

Adigun argues that allowing the immigration, passport, and social security fraud charges to be tried alongside the other offenses will prevent her from receiving a fair trial on the other offenses because "the current climate in this country is trending toward xenophobia," and trying all offenses at once would "poison the jurors' ability to provide her a fair verdict."  [Doc. 29 at 6].  However, Adigun's assertion in this regard is both speculative and conclusory, and therefore insufficient to carry her burden to demonstrate that trying the offenses together would result in compelling prejudice.  See Walser 3 F.3d at 386 (defendant's burden to show

compelling prejudice is "a heavy burden, and one which mere conclusory allegations cannot carry") (quoting United States v. Hogan, 986 F.2d 1364, 1375 (11th Cir. 1993)). The government points out that voir dire and the jury selection process serve to weed out biased jurors and protect a defendant's right to a fair trial. See [Doc. 44 at 10 (citing United States v. Hilario-Hilario, 529 F.3d 65, 72 (1st Cir. 2008))]. Adigun has failed to show that either the voir dire process or the use of limiting instructions would be inadequate to allow her to receive a fair trial.[45]   It is therefore **RECOMMENDED** that Adigun's motion to sever, [Doc. 29], be **DENIED**.

**B.   Search Warrant for the Navigator**

Defendants move to suppress evidence seized during the execution of the search warrant for the Navigator on November 12, 2007, contending that there was no probable cause to support issuing the warrant. See [Doc. 49; Doc. 99 at 15-16].

**1.   *Validity of the November 12, 2007, Warrant***

The Eleventh Circuit has explained the Court's review of the sufficiency of a search warrant as follows:

---

[45] Moreover, Adigun's arguments that the passport, immigration, and social security fraud offenses will necessarily cause "spillover effect" ignores the fact that, as discussed *supra*, proof of her identity in relation to the other charged offenses will require explaining her connection with Mary Kemi Afolabi, and thereby identify her as a Nigerian. Adigun's citation to United States v. Jones, 16 F.3d 487, 492 (2nd Cir. 1994), is misguided because in that case, the unfair prejudice arose from the fact that the charge defendant sought to sever required evidence showing that the defendant was a felon, which is considerably more prejudicial than evidence in this case that shows Adigun is from Nigeria.

> When called upon by law enforcement officials to determine the legitimacy of search warrants and their supporting affidavits, issuing magistrates and reviewing courts alike must strike a delicate balance between constitutional guarantees against excessive intrusions into areas of individual freedom and the Government's need to access and to secure relevant evidence in criminal prosecutions.  In particular, issuing magistrates are given the unenviable task of making "firing line" decisions that attempt to encourage availment of the warrant process while simultaneously striving to protect citizens from unwarranted governmental interference.   In recognition of the difficulty inherent in discharging this responsibility, reviewing courts lend substantial deference to an issuing magistrate's probable cause determinations.

United States v. Miller, 24 F.3d 1357, 1363 (11th Cir. 1994).

"The Fourth Amendment requires that a search warrant be issued only when there is probable cause to believe that an offense has been committed and that evidence exists at the place for which the warrant is requested."   United States v. Betancourt, 734 F.2d 750, 754 (11th Cir. 1984) (citing Zurcher v. Stanford Daily News, 436 U.S. 547, 558 (1978)).  "[P]robable cause deals 'with probabilities [which are] . . . the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"  Illinois v. Gates, 462 U.S. 213, 241 (1983) (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)).  "Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner."   Miller, 24 F.3d at 1361 (citation omitted).  Instead, "a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference

traditionally given to magistrates in their probable cause determinations." Id. (citation omitted). Furthermore, "the fact than an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause." United States v. Fama, 758 F.2d 834, 838 (2d Cir. 1985) (citations omitted). See also Adams v. Williams, 407 U.S. 143, 149 (1972) (citation omitted).

"Courts have uniformly rejected defense arguments that further investigation should have been conducted to either corroborate or to negate the information in the affidavit or else the search warrant lacks probable cause." United States v. Lebowitz, 647 F. Supp. 2d 1336, 1347 (N.D. Ga. 2009), adopted at 1342 (citing United States v. Shields, 458 F.3d 269, 280 (3rd Cir. 2006); United States v. Gourde, 440 F.3d 1065, 1072-73 (9th Cir. 2006) (en banc); United States v. Dale, 991 F.2d 819, 844 (D.C. Cir. 1993)). Though defendants argue that "[t]here is no evidence that the agents had traced the fraudulent credit application to any particular ISP address connected to [Onyekaba], or to any particular wireless router associated with him or the laptop," such rigor is not necessary to establish probable cause. Id. at 1348 ("The question in this case is not whether further investigation would have corroborated the statement in the affidavit that Defendant used [a particular] computer but whether the affidavit's factual statements, based on facts known to the affiant at that time, establish a 'fair probability' that [that] computer was used [to commit the crime]"); see also United States v. Wells, Criminal No. 07-448(1) (DWF/AJB), 2008 WL

4483735, at *3 (D. Minn. Sept. 30, 2008), adopted at *1 ("reference to IP addressing is not necessary to establishing the probable cause nexus to a location"); United States v. Huitt, No. CR-07-90-S-BLW, 2007 WL 2355782, at *7 (D. Idaho Aug. 17, 2007) ("affidavit's exclusion of certain information regarding IP addresses [did not] negate[] the magistrate judge's finding that probable cause existed").  Thus the Court must evaluate probable cause based on what information was actually presented to the magistrate, not based on what information could have been presented after further investigation, but was not.

Defendants also argue that there was no statement in the affidavit that Onyekaba used any computer, much less the laptop in the vehicle, to commit credit card fraud or identity theft, and that he "could have easily been using a home computer . . . or the computer of a third party."  [Doc. 49 at 7].  However, such a possibility does not remove the laptop in the vehicle from suspicion.  See Fama, 758 F.2d at 838.  Investigator Meeks stated in his affidavit and during his testimony that he believed that the fraudulent application was "made via internet connection" and "very likely done using the laptop visible in the Navigator."  [Doc. 49-1 at 4].  He also testified that it appeared, based on the laptop and the paperwork surrounding it, that Onyekaba was using the Navigator as a "mobile office," and was driving to locations to pick up deliveries of fraudulent credit cards.  [Doc. 49-2 at 4:30, 4:58].  Investigator Meeks also reported that when the officers approached Onyekaba to

question him, he fled the scene on foot, leaving behind the laptop and other items in the Navigator. [Doc. 49-1 at 4].

Where a "common sense and realistic" interpretation of the affidavit supports a reasonable likelihood that evidence of a crime might be found in a particular place, probable cause is not lacking. See United States v. Khanani, 502 F.3d 1281, 1290 (11th Cir. 2007) (holding that sufficient probable cause existed to search and seize office computers pursuant to a warrant seeking evidence of immigration and tax fraud violations, even though "the affidavit submitted to obtain the warrant order provided no fact-specific reason to believe there were computers in [defendant's] office, or that his computers had been used to facilitate the commission of any criminal violation").  Taking all of the facts and circumstances in the affidavit into account, Onyekaba drove the Navigator to a location to receive delivery of a credit card ordered by computer over the internet in the name of an identity theft victim, and his vehicle had within it a laptop computer, planner, and paperwork, all items likely to be "tools of the trade" of an identity theft and credit card fraud suspect. When the officers approached Onyekaba to question him, he fled the scene on foot, leaving behind the laptop and other items in the Navigator.  See United States v. Newman, 472 F.3d 233, 237 (5th Cir. 2006) ("While the fact that a man dashed out of the house, by itself, is not enough to create probable cause to search the house, . . . it is among the relevant contextual considerations in the probable cause analysis.");

United States v. Rodriguez-Alvarado, 510 F.2d 1063, 1064 (9th Cir. 1975) (per curiam) (flight in vehicle and on foot contributed to finding of probable cause to search vehicle); United States v. Boyd, 436 F.2d 1203, 1204-05 (5th Cir. 1971) (per curiam) (same).  A reasonable, common-sense interpretation of the facts laid out in the application for the search warrant leads to the conclusion that evidence of identity theft and credit card fraud might very well be found inside of the Navigator, including on the laptop computer and in the documents left behind when Onyekaba fled from the law enforcement officers.  The affidavit and Investigator Meeks' testimony before Magistrate Frey provide more than sufficient probable cause to search the Navigator, laptop, and other paperwork therein, and contrary to defendants' assertion, there was an adequate nexus between the Navigator and Onyekaba's suspected criminal activity.

### 2. *Good Faith Exception*

Even if the search warrant were found to be invalid, suppression of the evidence seized from the Navigator would not be warranted because the officers reasonably relied in good faith on the warrant.  See United States v. Leon, 468 U.S. 897 (1984).  Under Leon, "the exclusionary rule should not be applied to exclude evidence seized pursuant to a defective search warrant if the officers conducting the search acted in 'objectively reasonable reliance' on the warrant and the warrant was issued by a detached and neutral magistrate."  United States v. Maxwell, 920 F.2d

1028, 1034 (D.C. Cir. 1990) (citing <u>Leon</u>, 468 U.S. at 897-98; <u>Massachusetts v.</u>

<u>Sheppard</u>, 468 U.S. 981 (1984)).  <u>See also</u> <u>United States v. Robinson</u>, 336 F.3d 1293,

1295-96 (11th Cir. 2003).  There are four exceptions to the <u>Leon</u> good-faith exception

doctrine, none of which apply here:

> (1) where the magistrate or judge in issuing a warrant was misled by
> information in an affidavit that the affiant knew was false or would have
> known was false except for his reckless disregard of the truth; (2) where the
> issuing magistrate wholly abandoned his judicial role in the manner
> condemned in <u>Lo-Ji Sales, Inc. v. New York</u>, 442 U.S. 319, 99 S.Ct. 2319, 60
> L.Ed.2d 920 (1979); (3) where the affidavit supporting the warrant is so
> lacking in indicia of probable cause as to render official belief in its existence
> entirely unreasonable; and (4) where, depending upon the circumstances of
> the particular case, a warrant is so facially deficient-i.e., in failing to
> particularize the place to be searched or the things to be seized-that the
> executing officers cannot reasonably presume it to be valid.

<u>United States v. Martin</u>, 297 F.3d 1308, 1313 (11th Cir. 2002) (internal marks omitted).

Investigator Meeks is not alleged to have misstated any facts or shown reckless

disregard for the truth.  The factual background in the affidavit appears to have been

drawn from information received from Simpson and from Investigator Meeks'

direct, personal observations, and investigative experience.  Magistrate Frey acted

as an impartial magistrate, reviewing the affidavit supplied by Investigator Meeks,

and asking relevant questions with regard to the scope of the items listed in the

application.[46]  <u>See</u> [Doc. 49-2].  As discussed *supra*, the affidavit sets forth sufficient

---

[46] Adigun concedes that she "does not argue that the magistrate judge abandoned her judicial role in signing this warrant."  [Doc. 94 at 5 n.5].

probable cause, and in any case is not "so lacking . . . as to render official belief in its existence entirely unreasonable."[47] Martin, 297 F.3d at 1313.  Finally, the warrant is facially valid in that it describes in some detail the things to be seized, the locations for the search, and it is signed by Magistrate Frey.  See [Doc. 49-2 at 6-8].  Officers executing the warrant would therefore have been justified in believing in its validity, and evidence seized during its execution would not be subject to suppression. Sheppard, 469 U.S. at 981-82.  Accordingly, it is **RECOMMENDED** that defendants' motions to suppress evidence arising from the search of the Navigator, [Docs. 37, 42,

---

[47] Adigun argues that "it was entirely unreasonable for the [searching] officer to believe that what [Investigator Meeks] wrote in the affidavit - plus what he told the magistrate during his presentation of that affidavit - would be sufficient for a finding of probable cause to search the automobile" because "his recitation of the facts, standing alone, would be insufficient to support a search warrant for the car, a car which again was entirely unconnected to [Onyekaba's] suspicious behavior at the apartment complex."  [Doc. 94 at 5].  However, the Navigator was not "entirely unconnected" to Onyekaba's suspicious activity as Adigun asserts, and indeed, the facts laid out in Investigator Meeks' affidavit and in his testimony show that the Navigator was likely being used as a mobile base of operations for Onyekaba's alleged identity theft activities.  Investigator Meeks watched Onyekaba drive the Navigator to the apartment he was surveilling, and despite the fact that Onyekaba never carried the fraudulent card back to the Navigator, Investigator Meeks could nonetheless see that the Navigator contained a laptop computer and other documents, all of which were potentially related to Onyekaba's suspected identity theft activities, and possibly used to perpetrate the particular crime under investigation at that time.  The fact that Investigator Meeks' affidavit did not explicitly state the connection between the Navigator and criminal activity does not make it "'so lacking' in probable cause as to make the officer's reliance upon it entirely unreasonable" because the connection between the Navigator and Onyekaba's suspicious activity is clear in context.  Martin, 297 F.3d at 1314 n.8 (citing United States v. Marion, 238 F.3d 965, 969 (8th Cir. 2001)).

46, & 49], be **DENIED**.


**C.     Warrantless Vehicle Search on March 6, 2010**

Defendants move to suppress the evidence seized during the warrantless

search of the Navigator after Adigun was arrested on March 6, 2010, pursuant to the

Douglas County warrant.  The Fourth Amendment of the United States Constitution

guarantees "[t]he right of the people to be secure in their persons, houses, papers,

and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.

"It is well settled under the Fourth and Fourteenth Amendments that a search

conducted without a warrant issued upon probable cause is 'per se unreasonable

. . . subject only to a few specifically established and well-delineated exceptions.'"

Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Katz v. United States,

389 U.S. 347, 357 (1967); Coolidge v. New Hampshire, 403 U.S. 443, 454-455 (1971)).

The government asserts that the warrantless search of the vehicle was valid under

three of these exceptions: the automobile exception, as a search incident to arrest,

and as a consent search.

**1.     *Automobile Exception***

In Arizona v. Gant, — U.S. --, 129 S. Ct. 1710 (2009), the Supreme Court

"affirmed the viability of the probable cause exception for automobiles."  United

States v. Goldsmith, Criminal Action No. 4:09cr94, 2009 WL 4884408, at *3 (E.D. Tex.

Dec. 10, 2009), adopted at *1 (citing Gant, 129 S.Ct. at 1719). "Under the automobile exception, agents may conduct a warrantless search of a vehicle if (1) the vehicle is readily mobile (i.e., operational); and (2) agents have probable cause to believe the vehicle contains contraband or evidence of a crime." United States v. Tamari, 454 F.3d 1259, 1261 (11th Cir. 2006).[48] "The legality of a warrantless automobile search is based on the existence of probable cause to believe that the automobile is carrying contraband subject to forfeiture under the law, and the difficulties of securing a moveable vehicle while a warrant is obtained." United States v. Thomas, 536 F. Supp. 736, 742 (M.D. Ala. 1982). See also Chambers v. Maroney, 399 U.S. 42, 51-52

_____

[48] "[T]he mobility of an automobile is exigency enough," United States v. Nixon, 918 F.2d 895, 903 (11th Cir. 1990), and mobility is satisfied merely if "the automobile is operational," United States v. Watts, 329 F.3d 1282, 1286 (11th Cir. 2003) (per curiam). Defendants argue that the exigent circumstances were created by the officers executing the warrant because they could have executed the warrant earlier, perhaps while Adigun was on duty delivering mail, or while she was inside the post office, and that their waiting to execute the warrant until Adigun was inside the vehicle was an "end-run around the Fourth Amendment's warrant requirement." [Doc. 93 at 6]. Detective Guy admitted that one reason the officers chose to wait to execute the warrant was that they wanted to have a chance to search the vehicle, but he also testified that the primary reason they chose to wait was that they "wanted her to get off the postal property." (Tr. at 56). However, defendants' arguments regarding the timing and location of the arrest are without merit because "[a]n officer's 'subjective intentions' are not relevant for Fourth Amendment analysis." United States v. Hernandez, 418 F.3d 1206, 1210 n.4 (11th Cir. 2005). See also United States v. Berkowitz, 429 F.2d 921, 926 (11th Cir. 1970) ("We are unaware of any right of a defendant to be arrested at a particular time."); United States v. Joines, 258 F.2d 471, 472-73 (3rd Cir. 1958) ("ordinarily there is no legal requirement that a warrant of arrest must be executed immediately or at the first opportunity . . . [c]ertainly there is no constitutional right to be arrested promptly or otherwise").

(1970); <u>United States v. Alexander</u>, 835 F.2d 1406, 1409 (11th Cir. 1988).

Probable cause to search exists "'when the facts and circumstances would lead a reasonably prudent [person] to believe that the vehicle contains contraband.'" <u>Alexander</u>, 835 F.2d at 1409 (quoting <u>United States v. Clark</u>, 559 F.2d 420, 424 (5th Cir. 1977)) (alteration in original).  In determining whether probable cause exists, the Court "may examine the collective knowledge of the officers 'if they maintained at least a minimal level of communication during their investigation.'"  <u>United States v. Olmedo</u>, 552 F. Supp. 2d 1347, 1357 (S.D. Fla. 2008), adopted at 1350 (quoting <u>United States v. Willis</u>, 759 F.2d 1486, 1494 (11th Cir. 1985) (citation omitted)).  Thus, under the automobile exception, a warrantless search of a vehicle does not violate the Fourth Amendment "if the vehicle is operational and 'under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found' in the vehicle."  <u>Tamari</u>, 454 F.3d at 1262 (quoting <u>United States v. Goddard</u>, 312 F.3d 1360, 1363 (11th Cir. 2002) (internal marks omitted).

In this case, based on all the facts and circumstances known to the officers at the scene, the warrantless search of the Navigator was supported by probable cause to believe it contained evidence of identity theft and fraud.  Detective Guy knew from his investigation that Adigun was working as a USPS letter carrier under the false identity of "Mary K. Afolabi."  [Doc. 63 at 10-11]; (Gov. Ex. 7).  Detective Guy's investigation had identified several victims of identity theft and credit card fraud

who lived on Adigun's mail route, including Mintz. [Doc. 63 at 9-26, 30]. Prior to her arrest on March 6, 2010, Adigun had just completed driving her mail route, and returned to the post office. Detective Guy and other law enforcement officers on the scene saw Adigun exit her postal vehicle after completing her route, leave the post office carrying her purse, and enter the Navigator driven by Onyekaba. [Doc. 63 at 32].

After the Navigator was stopped, officers approached and asked Adigun and Oneykaba for identification. Adigun provided a Georgia driver's license in the name "Mary Afolabi,"[49] the false identity under which she had been working, and the name that had been connected to some of the fraud under investigation, including the fraud against Mintz, which was the subject of the arrest warrant for Adigun. See (Gov. Ex. 12). Officer Bowles ran the dealer license plate of the Navigator and found that it was registered to G.M.O., which also was connected to the fraud against Mintz. [Doc. 63 at 97, 107].[50] After comparing the dates of birth on the driver's license and the warrant, the officer confirmed the warrant was valid and asked Adigun to step out of the vehicle and placed her under arrest. Detective Guy

---

[49] Officer Bowles or Detective Walden conducted a check through their dispatch center of the identification Adigun presented, a Georgia driver's license with a number of 0571718354, which the dispatch center confirmed matched a Mary Afolabi with an address in Marietta. (Gov. Ex. 8; Gov. Ex. 16 at 4:47, 5:50).

[50] Detective Guy testified that he had previously seen the same vehicle on more than one occasion parked at the G.M.O. lot, but did not know who it was registered to or if it was offered for sale at the G.M.O. lot. [Doc. 63 at 63].

asked Adigun if she wanted her purse, and when she said yes, he went to the vehicle to retrieve it. (Gov. Ex. 16 at 13:55).

Before entering the vehicle, Detective Guy observed a wallet laying open on the center console "full" of cards, with all the slots for cards on both sides being filled. [Doc. 63 at 35, 50-51]. Detective Guy testified that, based on his training and experience, the large number of cards he observed in the wallet was consistent with credit card fraud and identity theft and was "highly unusual" for a person not engaged in criminal activity. [Doc. 63 at 36-37]. Detective Guy also observed papers scattered on the floorboard around the purse, consistent with his belief that Adigun was attempting to discard items from her purse when he observed her moving around inside the vehicle after it was stopped. [Doc. 63 at 35, 39].

The totality of these circumstances at the scene of the stop, coupled with the information Detective Guy knew from his investigation, provided probable cause to believe the vehicle contained evidence of identity theft and fraud. Specifically, Detective Guy knew that the endorsement "M. Afolabi" appeared on the back of checks drawn on an account in the name of Nancy Mintz bearing an address of 1305-B Natchez Trace, Apartment B, Marietta, Georgia, that were written out to and processed through G.M.O. [Doc. 63 at 15, 18-19]; (Gov. Exs. 5 & 6). Officer Bowles' check of the dealer plate revealed the Navigator to be associated with G.M.O, and

Onyekaba had told the officers he worked for G.M.O.  [Doc. 63 at 98].[51]  Since

Adigun produced a driver's license in the false identity of "Mary Kemi Afolabi"

when asked for identification, it was reasonable for Detective Guy to conclude when

he observed the numerous cards in her open wallet that she also had other forms of

false identification and or credit cards under false names, including the name "Mary

Afolabi," in her wallet or purse, which was inside the vehicle, further connecting

Adigun to the fraudulent scheme and to the Mintz fraud in particular.[52]

Taken together, all of these facts and circumstances provided probable cause

to believe that evidence of identity theft and fraud would be found within the

vehicle.  Cf. United States v. Richard, Criminal Action No. 4:09cr37, 2009 WL

2169892, at *7 (E.D. Tex. July 20, 2009), adopted at *1 (officers "who participated in

_____

[51] Detective Guy also believed that he had previously seen the vehicle parked at G.M.O., which he believed was not an operating auto dealership based on his investigation.  [Doc. 63 at 63, 98, 107].

[52] Detective Guy had by this time seen a photocopy of the fraudulent license bearing the name "Nancy Mintz" as well as the fraudulent Nigerian passport under the name "Mary Kemi Afolabi" and displaying Adigun's picture, and had reason to believe that these or similar fraudulent identity documents might be found in her purse or wallet since these are the customary locations for such documents to be stored.  Furthermore, the Natchez Trace address on the license Adigun presented was very similar to the Natchez Trace address on the fraudulent checks in Mintz's name.  Compare (Gov. Exs. 5 & 6 (bearing address of 1305 Natchez Trace Apartment B, Marietta Ga. 30008) with Gov. Ex. 8 (bearing address of 1337 Natchez Trace SW Apt. A Marietta, GA 30008)).  The 1305 Natchez Trace Apartment B address was also identical to the address used by Adigun to apply for postal employment under the name "Mary K. Afolabi," see (Gov. Exs. 5, 6, & 7), and Detective Guy testified that several different Natchez Trace addresses appeared "repeatedly" during his investigation of Adigun's suspected identity fraud crimes.  [Doc. 63 at 19-21].

the investigation, surveillance, arrest, and search of [the defendant's] vehicle had probable cause to believe that [evidence of identity theft and credit card fraud] was in [the] vehicle."). See also United States v. Dickey-Bey, 393 F.3d 449, 456-57 (4th Cir. 2004). Since the purse, wallet, and papers were found inside the vehicle, the officers had probable cause to search any part of the vehicle that could potentially contain evidence of fraud and identity theft. See Wyoming v. Houghton, 526 U.S. 295, 307 (1999) ("police officers with probable cause to search a car may inspect passengers' belongings found in the car that are capable of concealing the object of the search"); United States v. Ross, 456 U.S. 798, 825 (1982) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."). Thus, the search of the passenger compartment of the vehicle and seizure of cards and receipts therefrom was lawful under the automobile exception to the search warrant requirement.[53]

---

[53] Detective Guy's observations established probable cause to search the Navigator before Officer Bowles and Detective Walden entered the vehicle and began searching. See [Doc. 99 at 3 (providing timeline and citing Doc. 49-3 at 13:50, 16:19)]. Therefore, the fact that Officer Bowles was unfamiliar with the Supreme Court's decision in Gant regarding searches incident to arrest is inconsequential since the search initiated by Detective Guy was authorized under the automobile exception. See United States v. Lanzon, --- F.3d ----, 2011 WL 1662901 (11th Cir. May 4, 2011) ("A police officer's subjective reasons for a search do not control the legal justification for his actions, as long as objective circumstances justify the search.") (citing Scott v. United States, 436 U.S. 128, 136 (1978)); United States v. Webster, 625 F.3d 439, 445-46 (8th Cir. 2010) ("Warrantless searches need only be justified by one

## 2.    *Search Incident to Arrest*

The government argues that the warrantless search of the vehicle was also

authorized incident to Adigun's arrest.  In <u>Gant</u>, the Supreme Court ruled:

> Police may search a vehicle incident to a recent occupant's arrest only
> if the arrestee is within reaching distance of the passenger
> compartment at the time of the search *or* it is reasonable to believe the
> vehicle contains evidence of the offense of arrest.   When these
> justifications are absent, a search of an arrestee's vehicle will be
> unreasonable unless police obtain a warrant or show that another
> exception to the warrant requirement applies.

129 S. Ct. at 1723-24 (emphasis added).[54]  Because Adigun's arrest occurred outside

of the vehicle in which she was a passenger, and some distance away from it,

_____

exception to the Fourth Amendment warrant requirement; one of these exceptions
is the automobile exception, which 'authorizes a search of any area of the vehicle in
which the evidence might be found' if probable cause exists.'") (citing <u>United States
v. Grooms</u>, 602 F.3d 939, 942-43 (8th Cir. 2010)).  Thus, "the warrantless search was
justified under the automobile exception, irrespective of the applicability of the
search incident to arrest exception."  <u>Id.</u> (citation omitted).

[54] In <u>Gant</u>, officers arrested the defendant for driving on a suspended license,
handcuffed him, and placed him in a police vehicle.  129 S. Ct. at 1714-15.  After the
defendant had been secured, the officers then searched the vehicle incident to his
arrest.  <u>Id.</u> at 1714-15.  On appeal, the United States Supreme Court affirmed the
Arizona Supreme Court's decision that the search of the defendant's vehicle was
unreasonable within the meaning of the Fourth Amendment, explaining that the
broad scope of vehicle searches permitted under the prevailing circuit court
interpretation of <u>New York v. Belton</u>, 453 U.S. 454 (1981), was incorrect.  <u>Id.</u> at 1715,
1719, 1724.  The Court reasoned that officer safety and evidence preservation
concerns are sufficiently addressed if officers are permitted to conduct a vehicle
search only when an arrestee is actually within reaching distance of the vehicle.  <u>Id.</u>
at 1721.  The Court noted that under this rule, "it will be the rare case in which an
officer is unable to fully effectuate an arrest so that a real possibility of access to the
arrestee's vehicle remains."  <u>Id.</u> at 1719 n. 4 (citation omitted).

adjacent to one of the law enforcement vehicles parked behind it, "a reasonable officer could not consider [Adigun] capable of accessing [her] vehicle at the time the search was conducted." Goldsmith, 2009 WL 4884408, at *3.  However, the search of the Navigator nonetheless was lawful under Gant because the officers at the scene had a reasonable basis to believe the search would uncover evidence relevant to the financial identity fraud for which Adigun was arrested.[55]  See United States v. Reynolds, No. 3:08-CR-143, 2009 WL 1588413, at *3  (E.D. Tenn. June 4, 2009)

---

[55] The government urges the Court to adopt the reasoning of the D.C. Circuit in United States v.Vinton when evaluating the meaning of the phrase "reasonable to believe" as used by the Supreme Court in Gant:

> The Supreme Court did not elaborate on the circumstances when it will be "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." . . . Presumably, the "reasonable to believe" standard requires less than probable cause, because otherwise *Gant's* evidentiary rationale would merely duplicate the "automobile exception," which the Court specifically identified as a distinct exception to the warrant requirement. Rather, the "reasonable to believe" standard probably is akin to the "reasonable suspicion" standard required to justify a *Terry* search. . . .  Accordingly, the officer's assessment of the likelihood that there will be relevant evidence inside the car must be based on more than "a mere hunch," but "falls considerably short of [needing to] satisfy[ ] a preponderance of the evidence standard."

594 F.3d 14, 25 (D.C. Cir. 2010) (internal citations omitted).  Adigun, on the other hand, asserts that the "reasonable to believe" standard is equivalent to probable cause.  See [Doc. 93 at 20-24].  The Eleventh Circuit has not yet addressed this issue, and this Court need not do so in this case because, whether measured by probable cause or a lesser standard, it was reasonable for the officers on the scene to believe the vehicle contained evidence of the offense of financial identity fraud for which Adigun was arrested.

(applying <u>Gant</u> and holding "[g]iven the circumstances surrounding defendant's arrest, it was reasonable for the officers to believe that a search of [the defendant's] vehicle would produce evidence related to that crime, and therefore the officers were justified in conducting a warrantless search of [the defendant's] vehicle as an incident to his arrest").

For the reasons discussed in connection with the automobile exception, based on the investigation conducted by Detective Guy and other law enforcement officers, and the circumstances surrounding the stop of the vehicle in which defendants were traveling together, it was reasonable for the officers on the scene to believe that the passenger compartment of the Navigator contained evidence of the crime of financial identity fraud for which Adigun was arrested. Detective Guy knew from his investigation that several fraud victims, including Mintz, were on Adigun's mail route, and thus he had reason to believe that Adigun was stealing identity information from the mail. [Doc. 63 at 9-26, 30]. On the day she was stopped and arrested, he watched her exit her postal vehicle after completing her route, leave the post office carrying her purse, and enter the Navigator being driven by Onyekaba. [Doc. 63 at 32]. Detective Guy recognized the Navigator as a vehicle he had seen parked at the G.M.O. lot, and when Officer Bowles stopped the vehicle, he ran the dealer license plate of the Navigator and found that it was registered to G.M.O., which was connected to the fraud against Mintz. [Doc. 63 at 97, 107]. When Adigun

produced the driver's license in the false name of "Mary Kemi Afolabi" and

Detective Guy observed in her open wallet numerous other cards, which from his

experience was "highly unusual" for someone not involved in criminal activity, and

typical of someone committing identity theft and credit card fraud, he had reason

to believe that he would find in the vehicle evidence connecting her to the financial

identity fraud for which she was arrested, i.e., evidence that Adigun was the "M.

Afolabi" who endorsed the fraudulent checks in Mintz's name negotiated through

G.M.O.[56]  [Doc. 63 at 36-37].  Thus, the warrantless search of the vehicle was also

justified under the second prong of <u>Gant</u> as a search incident to arrest for evidence

---

[56] The government also argues, and the undersigned agrees, that Detective Guy's seizure of at least the wallet at this point would be justified under the plain-view doctrine.  <u>See</u> [Doc. 76 at 24-27 (quoting <u>Minnesota v. Dickerson</u>, 508 U.S. 366, 375 (1993) ("if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.")].  Though credit cards and gift cards are not ordinarily of an obvious "immediately apparent" criminal nature, a suspiciously large number of such cards in the context of a credit card and identity fraud investigation makes their incriminatory nature apparent to the searching agent.  <u>See</u> <u>United States v. Hamie</u>, 165 F.3d 80, 83 (1st Cir. 1999) (upholding plain view seizure of credit cards and identity documents and stating that "[t]he term 'immediately apparent' has been defined as sufficient to constitute probable cause to believe it is evidence of criminal activity [i.e.,]. . . [t]here must be enough facts for a reasonable person to believe that the items in plain view may be contraband or evidence of a crime. A practical, nontechnical probability that incriminating evidence is involved is all that is required."); <u>United States v. Sealander</u>, 91 F.3d 160, 1996 WL 408368, at *20 (10th Cir. 1996) (unpublished) ("The agents in this case had a right to be in [defendant's] room pursuant to his arrest warrant, and the credit cards were of an immediately apparent incriminating nature given the credit card/bank fraud charges on which [defendant] was arrested.").

of the crime for which Adigun was arrested.  Accordingly, it is **RECOMMENDED** that defendants' motions to suppress evidence seized from the vehicle on March 6, 2010, be **DENIED**.[57]

## D.    Searches of G-Rock Restaurant

Adigun argues that Detective Guy and Agent DelMastro's warrantless searches of the premises of G-Rock restaurant violated the Fourth Amendment because Tabb had failed to lawfully evict her from the premises prior to granting law enforcement permission to enter and seize any items they believed to have evidentiary value.  [Doc. 111 at 9-17].  Although both Adigun and the government have discussed in detail the lease between Tabb and Adigun, whether the lease had been breached, and whether Tabb had actually evicted Adigun and regained lawful possession of the premises of G-Rock restaurant, the Court need not resolve these issues because it finds that Detective Guy and Agent DelMastro reasonably believed that Adigun no longer had possession of the premises based on Tabb's statements and the surrounding facts and circumstances.[58]  Therefore their searches of the

---

[57] Having found that the search of the vehicle was justified incident to Adigun's arrest and under the automobile exception, the Court need not address the government's alternative argument that the search was valid based on Onyekaba's consent.

[58] Both parties made arguments regarding whether Tabb had properly conducted a "self-help" eviction under Georgia law, whether he had lawfully evicted Adigun under the default and notice provisions of the lease, and whether Adigun's non-use of the premises as a restaurant and failure to pay utility bills constituted abandonment of the premises under Georgia law.  [Doc. 111 at 12-17;

premises and seizure of items therein did not violate the Fourth Amendment.

In analyzing a warrantless search of a rental property, "a landlord generally lacks common authority to consent to a search of a tenant's [premises]."  United States v. Brazel, 102 F.3d 1120, 1148 (11th Cir. 1997) (citing  Chapman, 365 U.S. 610). Fourth Amendment protections for rented business premises are the same as for rental residences.  See United States v. Martinelli,  454 F.3d 1300, 1308 n.6 (11th Cir. 2006).   However, "a tenant who abandons the property loses any reasonable expectation of privacy he once had." Brazel, 102 F.3d at 1148 (citing  Abel v. United States, 362 U.S. 217, 241 (1960)).  Additionally, "[a] third party's consent to search an area is valid if he has mutual use of it, with joint access to or control of the area for

---

Doc. 114 at 2-17; Doc. 117 at 1-4].  However, "'it is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical. . . .  (W)e ought not to bow to them in the fair administration of the criminal law." Chapman v. United States, 365 U.S. 610, 617 (1961) (quoting Jones v. United States, 362 U.S. 257, 266-267 (1960) overruled by United States v. Salvucci, 448 U.S. 83, 85 (1980).  See also United States v. Knepper, 256 Fed. App. 982, 984 n.1 (9th Cir. 2007) (unpublished) (noting while discussing defendant's Fourth Amendment interest in an apparently abandoned property from which he had not yet been formally evicted, "a defendant's own and in part self-serving retrospective characterization of his state of mind with respect to the question of intention to return is not simply and automatically dispositive of the issue, and that the local law of real property does not provide the exclusive basis upon which to decide Fourth Amendment questions") (citations and internal marks omitted).  Since the legality of Detective Guy's search does not turn on whether Tabb properly evicted Adigun, the Court need not decide these contested questions of state property law, and may resolve the issue entirely on analysis of Fourth Amendment principles.

most purposes."  Id. (citing United States v. Matlock, 415 U.S. 164, 171 n. 7 (1974)).

Finally, "even if the consenting party does not, in fact, have the requisite

relationship to the premises, there is no Fourth Amendment violation if an officer

has an objectively reasonable, though mistaken, good-faith belief that the consent

he has obtained valid consent to search the area."  Id. (citing Illinois v. Rodriguez,

497 U.S. 177, 186 (1990)).  See also United States v. Garcon, No. 07-80051-CR, 2008

WL 60405, at *9 (S.D. Fla. Jan. 3, 2008), adopted at *1.

    "A criminal defendant's right to challenge a search and/or seizure as being

violative of the fourth amendment is premised upon the existence of a legitimate

expectation of privacy in the invaded place," and "[t]he burden of persuasion on this

issue is placed squarely on the movant." United States v. Friere, 710 F.2d 1515, 1518-

19 (11th Cir. 1983) (citing Rakas v. Illinois, 439 U.S. 128, 130 n.1, 142-43 (1978); United

States v. Torres, 703 F.2d 1267, 1271 (11th Cir.  1983)) (footnote omitted).  Assuming

without deciding that Adigun has carried her burden with regard to demonstrating

a legitimate expectation of privacy in G-Rock restaurant, Detective Guy and Agent

DelMastro's searches were lawful pursuant to Tabb's consent if they had a

legitimate, good faith basis for believing Tabb had authority to give consent to

search.  Brazel, 102 F.3d at 1148 ("[T]he officer seizing the evidence had an

objectively reasonable good-faith belief that the premises were vacant and that he

had obtained valid consent for the search from the landlord."); Garcon,  2008 WL

60405, at *9-10 (upholding search where "law enforcement had an objectively reasonable good faith basis upon which to believe that the tenant in fact vacated and the landlord had authority to allow access to the unit."). <u>See also</u> <u>United States v. Law</u>, 528 F.3d 888, 904 (D.C. Cir. 2008) (per curiam).

Based on the evidence before the Court, the undersigned concludes that Detective Guy and Agent DelMastro had a reasonable, good faith basis for believing that Tabb had possession of G-Rock restaurant and thus the authority to consent to a search of the premises. Tabb initiated contact with law enforcement after learning that Adigun had been arrested and jailed, and after determining that G-Rock restaurant was no longer operating, that the utilities had been cut off, and after he had sent several notices demanding payment of past-due rent and threatening eviction. Upon contacting law enforcement, it was Tabb who requested that law enforcement officers accompany him into the building because he believed it was abandoned, and was "afraid to go in" alone. [Doc. 110 at 41, 67-68]. These officers told him that they wanted Tabb to "gain possession" prior to any law enforcement officers entering the building. [Doc. 110 at 41]. When first speaking with Detective Guy, Tabb informed him that he had "evicted the persons who had leased the building" and "was getting ready to . . . clean the building out." [Doc. 110 at 71]. Detective Guy said that on August 3, 2010, the day of their first meeting, Tabb told him that he and his son were the property owners, that Tabb "had possession," and

that Tabb had evicted the tenants for non-payment of rent.  [Doc. 110 at 42, 73, 83-84].  When Detective Guy returned to G-Rock restaurant on August 6, 2010, accompanied by Agent DelMastro, Tabb again unlocked the front door using his key.  [Doc. 110 at 44-45, 79-80].

Although Detective Guy did not take the time to review the minutiae of the lease documents to confirm that Tabb had complied with all of the default and notice provisions therein, Tabb presented Detective Guy with documentation, and based on the visible state of the property,[59] the fact that Detective Guy knew that Adigun had been incarcerated nearly three months earlier in May, Tabb's assertions that he had possession of the property, and the fact that Tabb had a key that allowed him to unlock the front and interior doors, a reasonable person in Detective Guy's position would have believed that Tabb had in fact evicted Adigun, or that she had abandoned the premises, leaving Tabb, the landlord, in possession.  Cf. Law, 528 F.3d at 904 ("agents reasonably relied on [landlord's] representation that she had authority to consent to a search of [defendant's] apartment" where the landlord informed agents that the apartment to be searched was "currently vacant and [was]

---

[59] While Adigun points out that signage remained in place on the exterior of the building and business hours were posted, [Doc. 111 at 8], the front door was locked, all utilities had been cut off, and the interior of the building was in disarray, despite some items of value having been left behind; [Id. (citing Doc. 110 at 43, 66, 76, 92)].  Given these circumstances, a reasonable person could easily conclude that G-Rock restaurant was no longer an operating business in spite of the fact that the exterior signage had not been removed.

59

being used to store some furniture and other matters" but that the defendant "might have a set of keys.") (internal marks and citations omitted); <u>Brazel</u>, 102 F.3d at 1148-49 (detective's belief that premises were vacant and landlord had possession upheld where "[t]he detective . . . testified that at the time of the search, he . . . knew that [defendant was] being held in custody since [his] arrest[]" and "[b]oth the detective and the owner testified that they thought the premises were vacant."); <u>Garcon</u>, 2008 WL 60405, at *10 (upholding law enforcement's entry into an apartment pursuant to leasing staff's consent where primary tenant and the only lessee conveyed an intention to leave and apparently moved out, and secondary resident, the defendant challenging the search, had not been seen by apartment staff "for a couple of days" before the search and apartment staff "assumed he vacated" despite the fact that he had left personal belongings behind.) (internal marks omitted).  Therefore, Detective Guy's belief that Tabb had possession and authority to consent to a search of G-Rock restaurant was objectively reasonable, and the subsequent search and seizure of the premises by Detective Guy and Agent DelMastro did not violate the Fourth Amendment.

Adigun argues that the above analysis is vitiated by the fact that Detective Guy's mistake as to Adigun's possessory interest in G-Rock restaurant was one of law, and not of fact, [Doc. 111 at 11-12 (citing <u>Brazel</u>, 102 F.3d at 1148; <u>United States v. Brown</u>, 961 F.2d 1039, 1041 (2d Cir. 1992) (per curiam))], but this is simply not the

case.  Even assuming Tabb had not properly evicted Adigun, Detective Guy's only mistake would have been one of fact as to whether or not Tabb had actually evicted Adigun, and thereby had possession of the premises and the authority to consent to a search.  The <u>Brazel</u> court explained that "[a]ny mistake made by the detective as to whether the premises were vacant was, moreover, a mistake of fact, not one of law" and explained the difference by comparing <u>United States v. Elliot</u>, 50 F.3d 180, 187 (2d Cir. 1995) ("since the question whether a given unit is unleased is one of fact, the officers' belief that an area was vacant and thus the owner could consent to a search was a factual error, if error at all") with <u>Brown</u>, 961 F.2d at 1041 ("warrantless entry of tenant's apartment was unconstitutional where officer made the mistaken legal conclusion that a landlord's authority to turn off electrical appliances or lights also validated the officers' search of the apartment").  102 F.3d at 1149.  <u>See also</u> <u>Stinson, Lyons, Gerlin & Bustamante, P.A. v. Brickell Bldg. 1 Holding Co.</u>, 923 F.2d 810, 815 (11th Cir. 1991) ("Whether constructive eviction has occurred is a question of fact.").  The situation in the instant case is akin to the factual scenario in <u>Elliot</u> in that Tabb told Detective Guy that he had evicted the tenant, that he had possession of the premises, and that the premises were vacant.  <u>See</u> 50 F.3d 180 at 187.  Thus, even assuming Detective Guy was mistaken, it was a mistake of fact, not of law.  <u>See</u> <u>id.</u> ("The officers would have committed a mistake of law had they drawn an erroneous conclusion about the scope of the landlord's authority based on the facts

61

known to them."). Detective Guy and Agent DelMastro's searches of G-Rock restaurant and seizure of items therein pursuant to Tabb's consent were therefore lawful, and it is **RECOMMENDED** that Adigun's motion to suppress evidence seized at G-Rock restaurant, [Doc. 73], be **DENIED**.

### III.  CONCLUSION

For the foregoing reasons and cited authority, it is **RECOMMENDED** that Adigun's motion to sever, [Doc. 29], and defendants' motions to suppress evidence and statements, [Docs. 30, 31, 32, 37, 42, 46, 49, & 73], be **DENIED**.  There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.  **IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED AND RECOMMENDED**, this 4th day of May, 2011.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

62